CHARLES G. LANDON et al., executors of the will of Benjamin Hutton, deceased,

*v.*

CHARLES GORDON HUTTON et al.

1. A voluntary written release of indebtedness, not under seal, is invalid in law and will not, in absence of some special equity, be enforced in this court.

2. An incomplete voluntary trust, resting in *fieri*, will not be enforced in equity.

3. To raise an equity in virtue of meritorious consideration, sufficient to induce the enforcement, between volunteers, of a gift or an incomplete trust, not supported by valuable consideration, but which was fully intended and partially carried into effect by a deceased parent in behalf of a child or children, the case must plainly appear to be within a single and well defined purpose of the parent to execute the *natural parental duty to support and maintain* his child or children, which cannot be defeated without obvious injustice.

4. Where a husband was indebted to his wife and by contemporaneous acts, to conform with the last wishes of his wife, reduced the debt to his possession and ineffectually attempted to create a trust of about the equivalent of the debt in money—*Held*, that there existed valuable consideration which would induce equity to complete and enforce the trust.

On settlement of account of executors of the will of Benjamin Hutton, deceased.

By its decree herein, dated on March 23d, 1891, in pursuance of agreement between counsel, the court reserved two disputed matters for future determination—*first*, whether the share of the testator's daughter Anna, the Countess de Moltke-Huitfeldt, who survived her father, but is now deceased, shall be allowed credit

for fifty thousand francs upon the indebtedness of her husband, the Count de Moltke-Huitfeldt, to her father, and, *second,* whether a valid and presently existing trust of $14,000, as hereinafter defined, was created by Benjamin Hutton in his lifetime.

Those matters are now to be considered and decided. They are presented by a stipulation which discloses the following facts :

As to the first question :

The will of Benjamin Hutton bears date on the 1st day of June, 1868, and has annexed to it seven codicils, the first of which was executed on the 6th of June, 1890. By that codicil the testator made the following provision :

" I have heretofore loaned to my son-in-law, the Count Harold de Moltke-Huitfeldt, certain sums of money and I have become responsible for certain other sums, all which appear upon my books, charged under his name. I therefore do further will and direct that if my daughter Anna shall die before her husband, the said Count Harold de Moltke-Huitfeldt, then, in that event, all the sums of money due to me from the said Count Harold de Moltke-Huitfeldt at the time of my death shall be deducted from the bequests to him of thirty thousand dollars as in my will contained; but in case distribution of my estate under my said will shall be made during the lifetime of my said daughter Anna, then the said amount of the indebtedness to me of her said husband shall form part of her share of my residuary estate as provided in my said will.

" I further will and direct that any securities which I may have taken or to which I may be entitled at the time of my death for the repayment of my said loans, advances and liabilities to and for Count Harold de Moltke-Huitfeldt shall be assigned and delivered to my said daughter, Anna, as and for her sole and separate estate, free from all control, interference, debts or liabilities of her said husband."

At Mr. Hutton's death, in February, 1884, according to his books of account, there was due to him from Count Harold de Moltke-Huitfeldt upwards of two hundred and seventy-one thousand francs. The count had died during Mr. Hutton's lifetime.

After her father's death and upon the distribution of his estate, the Countess de Moltke-Huitfeldt produced to his executors the following document which he had signed :

Landon v. Hutton.

"After having informed myself of the condition of the affairs of the estate of Monsieur Count Harold de Moltke-Huitfeldt, my son-in-law, and desiring to facilitate to my daughter the liquidation which she proposes to make of it as universal legatee of her husband.

" Recognizing more over that in the present situation the claim which I have against that estate is exposed to loss (compromised). I declare that I consent to the remission pure and simple of a sum of fifty thousand francs of the total of that claim. And I consent that all the creditors of the estate shall be paid before the balance of that which is due me.

" Paris January 15, 1879.                     B. H. HUTTON."

The executors of Mr. Hutton's will, in determining his daughter Anna's share, charged her with the entire amount of her husband's indebtedness without deducting the fifty thousand francs contemplated in the instrument above set forth. The question now presented is, whether such a deduction should not have been made.

As to the second question :

The wife of Mr. Hutton died in June, 1879. At that time Mr. Hutton's books contained an account headed as follows :

" Mad. A. H. Hutton, Special acct.
    " in acct. with B. H. Hutton."

which exhibited a balance of $13,383.15 against Mr. Hutton.

Charles G. Landon then had charge of Mr. Hutton's books and the general management of his property, and while he had that charge and management, in July, 1880, received from Mr. Hutton a letter of this tenor :

" Will you please have the account closed now standing on my books in the name of my late wife, Mrs. A. H. Hutton. Transfer the balance, $13,383.15-100 to credit of my personal account. Then have opened on my books a new account in the name of my daughter the Ctess H. de Moltke-Huitfeldt Trustee, and place to the credit of the same the sum of $14,000.00."

The directions of this letter were complied with.

On the 15th of July, Mr. Hutton wrote to his daughter the Countess de Moltke-Huitfelt, from Orange, New Jersey, where he was then domiciled, as follows

Landon v. Hutton.

"I have this day directed my book-keeper, Mr. Walschilds, to place to your credit as trustee, on my books, the sum of $14,000 Dollars.

"The trust is as follows:—

"*First.* To indemnify yourself against any cost, outlay and expense whatever, by reason of your liability on your contract of suretyship to Mr. Sandrin of Paris, to secure the payment to him of a debt owing by your brother Charles Gordon Hutton.

"*Second.* To pay over whatever sum may remain in your hands, after providing for your indemnity as aforesaid to your sister the Mrse. de Portes. The above sum is not intended as an advancement out of my estate to any of the persons above named and referred to, but is placed in your hands for the purpose of carrying out the last wishes of my late wife.

"Your affectionate father,

"B. H. Hutton."

Under this letter the Countess de Moltke-Huitfeldt wrote and signed this:

"Orange 15th July, 1880.

"I accept and promise to carry out the above trusts.

"Ctess. H. de Moltke-Huitfeldt."

This document remained in possession of the countess until her death in January, 1889.

By a codicil to her will, which is dated on the 7th of January, 1889, at Paris, the countess says:

"I declare that the sum entered in my father's books in my name in trust is destined to be restored to my two nephews, Rene and Henry de Portes in equal portions."

The indebtedness to Mr. Sandrin, of Paris, was paid by Charles Gordon Hutton, so that his sister was not put to any expense because of it.

Mr. Landon, who is an executor of Mr. Hutton's will, has deposited $14,000 of the testator's moneys in a trust company, where it remains, subject to such disposition as the court may order.

*Mr. Thomas N. McCarter*, for the executors of Benjamin Hutton.

*Mr. Frederic W. Stevens*, for the executors of Countess de Moltke-Huitfeldt and Rene and Henry de Portes.

THE CHANCELLOR.

I. The first question is whether the share of Anna, the Countess de Moltke-Huitfeldt, in her father's estate, shall be allowed credit for fifty thousand francs.

By his codicil of 1870, Mr. Hutton charged the share of his daughter Anna in his estate with the indebtedness of her husband to him at his death. Whatever securities the father should have taken were to be hers, so that she should be in position to recover from her husband's estate.

After this codicil had been made and while Mr. Hutton lived, his son-in-law, Count Harold de Moltke-Huitfeldt, died, being very largely indebted to him and to others. Thereupon the Countess de Moltke-Huitfeldt, who was her husband's universal legatee and as such entitled to the residue, if any, of his estate, undertook to liquidate his indebtedness. Her father inquired into the condition of her husband's estate, and, sympathizing with her undertaking and appreciating that some compromise of indebtedness was necessary in order to facilitate her proposed liquidation of it, declared, in writing signed by him, that he consented to the remission, "pure and simple," of fifty thousand francs from the indebtedness to him, and also that all other creditors should be paid before him.

The executors of the will of Mr. Hutton afterwards refused to remit fifty thousand francs from the indebtedness.

The intended remission or forgiveness of the debt does not appear to have valuable consideration to support it. It is not shown that it either secured a benefit to Mr. Hutton or cost his daughter loss or disadvantage. The remission was not under seal. It apparently was the testator's bounty, "pure and simple," as the language of the document he signed indicates. Is such a forgiveness of a debt valid?

In *Tulane* v. *Clifton, 2 Dick. Ch. Rep. 354,* I stated my view of the law upon this subject as follows : "Delivery is essential to the completion of a gift. When a thing given is capable of actual delivery, there must be some act equivalent to it. Said Chancellor Kent (*2 Kent Com. 439*):

" ' It must be *secumdum sejectam materiam*, and be the true and effectual way of obtaining the command and dominion of the subject.  As has been seen, the true and effectual way to voluntarily deliver up or forgive a debt, is to release it by an instrument of due solemnity. . The delivery of such an instrument is a delivery of the forgiveness of the debt, and the best delivery that can be made of forgiveness, and, therefore, it is necessary in the execution of an agreement to forgive the debt, and the only delivery which will make such voluntary forgiveness a completed gift.  Between the promise and the limit within which the debt may be collected by process of law is the *locus penitentiæ*, within which the promissor may draw back from his voluntary agreement.  During that time, acts merely indicative of intention, which do not prejudice the promisee, are not an execution of the promise.' "

I should add to this that the instrument of due solemnity, referred to, should be an absolute release under seal, for the presence of the seal is necessary to dispense with the necessity of proving consideration.  *Aller* v. *Aller, 11 Vr. 446, 452 ; Day* v. *Gardner, 15 Stew. Eq. 201 ; Irwin* v. *Johnson, 9 Stew. Eq. 350, 351.*

I do not perceive how the consent in the.present case can, by the rules of law, be construed into a valid forgiveness.

It is urged that there exists here a meritorious consideration which will raise an equity to support this forgiveness.  I will refer to the office of that consideration after I shall have stated my conclusion upon the next question presented.

II. The second question is whether a valid and permanently existing trust of $14,000 was created by Benjamin Hutton.

At her death, Mrs. Hutton had an account with her husband, upon his books, which exhibited a balance of .$13,383.15 to her credit.  This balance Mr. Hutton transferred to his personal account.  Then he opened a new account upon his books, with his daughter as trustee, to which he credited $14,000.  Upon doing this he, in writing, informed the daughter of what he had done, and also defined his proposed trust, and declared that it was not intended as an advancement to either of his children, but to conform with the last wishes of his deceased wife.  The daughter, by subscription to his letter, signified her acceptance of the trust and agreed to perform it.

It is argued for the executors that this trust has no valuable consideration to support it; that the transfer of the balance of

Mrs. Hutton's account to the personal account of Mr. Hutton does not afford a consideration; that it is not disclosed whether Mrs. Hutton's account represented an indebtedness or her husband's promised bounty to her, and it is immaterial whether it be regarded as standing in one or the other of those characters, for, if it represented indebtedness, the indebtedness was discharged by the husband's assertion of his legal right upon his wife's intestacy, by the transfer of her credit balance to his personal account, and, if it represented his bounty, it stood upon his books as a promise unexecuted by delivery—a nullity.

It is very clear to me that if Mr. Hutton availed himself of his legal right to convert his wife's credit to possession and then voluntarily created the trust she desired, of his bounty and not in virtue of valuable consideration, his entry in his books and his letter to his daughter did not divest him of his estate in the $14,000. That it was his intention to divest himself of that estate and that he believed that he had accomplished his purpose, can hardly be doubted. His action shows his intention, and his expression in his letter to his daughter, " but is placed in your hands" &c., evinces his belief that his intention had been carried into effect. But such intention and belief are not enough. What was the effect of that which he did? He entered upon his own books a credit in favor of his daughter, notified her of that credit and defined its purpose, but he did not apportion out or deliver to her any particular money or property. On the contrary, he himself retained possession and control of all his money and property. His credit stood on his books merely as a promise, upon her demand, to take from his money and pay to her to the extent of $14,000. She never demanded the money and both he and she died before there had been delivery of any part of it. No one appears to have done any act upon faith in the credit or to have suffered any prejudice because of it. It cannot be doubted, under such circumstances, that there was no perfected gift at law.

And I cannot adopt the suggestion of counsel, that Mr. Hutton intended by the entry to declare a trust in himself. The fact, that he styled his daughter the trustee and defined the trust in her,

Landon *v.* Hutton.

negatives the soundness of such a position. It is most clear that Mr. Hutton intended to create a trust in another and not to declare himself the trustee. The conclusion appears to me to be unavoidable that the trust was incomplete when Mr. Hutton died.

But I do not consider the position of the executors that the trust is unsupported by valuable consideration to be sound. The existence of the credit upon Mr. Hutton's books in favor of his wife, in absence of explanation, was an acknowledgment, and therefore, at least, *prima facie* evidence of a present indebtedness to the wife—an admission of a property in her which was subject to disposition by her will. The declaration of Mr. Hutton that the trust was created in compliance with his wife's last wishes indicates that she contemplated the disposition of this very credit or property in a direction different from that which the law would give it if she died intestate, and also that she communicated her purpose to her husband and that he either agreed to carry out those wishes or was so influenced by them that he afterwards determined not to avail himself of his legal right of converting her credit into his property without regard to her wishes, but, on the contrary, that he determined to accept that credit as a valuable consideration for the creation of the trust she desired. By one and the same instrument he reduced her credit to his possession and attempted to make the trust. Those acts were done contemporaneously and in an order which signifies that one was the consideration for the other. I am satisfied that this is the true view in which I should decide this question. In it is found the valuable consideration which will induce this court to complete and enforce the imperfectly created trust.

If my conclusion be wrong, I am then driven to the inquiry whether this trust, as well as the gift involved in the first inquiry, may be sustained in equity by meritorious consideration—that is, such consideration as springs from the natural and moral obligation of the parent to provide for and maintain his offspring.

To indicate its use, I should perhaps preface the suggested inquiry by a statement of the rule of equity with reference to the enforcement of an imperfect voluntary trust.

Landon *v.* Hutton.

It is well established and known that where a trust is actually created and the relation of trustee and *cestui que trust* clearly exists, a court of equity will, in favor of a volunteer, follow the trust and enforce its execution against the person creating it and all subsequent volunteers; but it will not create a trust or establish the relation of trustee and *cestui que trust* by enforcing an agreement or giving effect to an imperfect conveyance or assignment in favor of volunteers. *Ellison* v. *Ellison, 1 Lead. Cas. Eq. (pt. 1) 291, 6 Ves. 656.*

While a voluntary settlement in trust remains executory, equity will not enforce it, but will consider it a nullity. There has been much perplexity and difficulty experienced in the application of this rule, because it is often a question of much nicety to determine whether a trust has, in fact, been established. Says Mr. Perry, in his works on *Trusts,* § *98 :*

" But if the trust is perfectly created so that the donor or settlor has nothing more to do, and the person seeking to enforce it has need of no further conveyances from the settlor, and nothing is required of the court but to give effect to the trust as an executed trust, it will be carried into effect at the suit of a party interested."

In *Jones* v. *Lock, L. R. (1 Ch. App.) 25,* Lord Cranworth said : " I do not think it necessary to go into any of the authorities cited before me. They all turn upon the question whether what has been said was a declaration of trust or an imperfect gift. In the latter case the parties would receive no aid from a court of equity if they claimed as volunteers; but if there has been a declaration of trust, then it will be enforced whether there has been a consideration or not. Therefore the question in each case is one of fact, has there been a gift or not, or has there been a declaration of trust or not ? "

It is to be observed that there exists a distinction between the cases in which the donor or settlor holding the legal title unequivocally declares himself to be the trustee, and the cases in which, otherwise than by will, he makes a stranger the trustee. In the first class of cases a distinct declaration of the trust in himself, without more, appears to be sufficient, while in the

latter class it is held that the question, whether or not a trust has been created, must be determined upon principles of strict law governing the perfect transfer of a legal title, under which the most distinct evidence of intention to pass an interest may not be conclusive.

It is said by Mr. Perry (§ 100) that

"if the donor or settlor propose to make a stranger the trustee of his property and the property is a legal estate, capable of legal transfer or delivery, the trust is not perfectly created unless the legal interest is actually transferred to or vested in the trustee. It is not enough that the settlor executed a paper purporting to pass it, if, in fact, the paper does not have that effect. The intention of the settlor to divest himself of the legal title must be consummated and executed, or the court will not enforce the trust."

And in *Lewin on Trusts* (at *p. 69*), it is said ·

"If it be proposed to make a stranger the trustee, and the subject of the trust is a legal interest and one capable of legal transmutation as lands or chattels, which passes by conveyance, assignment or delivery, or stock, which passes by transfer, in this case the trust is not perfectly created unless the legal interest be actually vested in the trustee. It is not enough that the settlor executed a deed affecting to pass it, and that he believed nothing to be wanting to give effect to the transaction. The intention of divesting himself of the legal property must, in fact, have been executed, or the court will not recognize the trust."

It is to avoid the application of this rule, and that rule which I have applied to forgiveness of indebtedness, that it has been insisted by counsel that the relationship between Mr. Hutton and the beneficiaries of his proposed gift and trust, affords the *meritorious consideration* which will induce a court of equity to enforce his defined intention. It is urged that it was his purpose, in forgiving the indebtedness and creating the trust, to provide for and benefit his children.

Of the species of consideration here relied upon, Professor Pomeroy (*2 Pom. Eq. Jur.* § *588*) says :

"The third [species of consideration] constitutes the meritorious or imperfect consideration of equity and is recognized as effective by it within very narrow limits, although not at all by the law. While this species of consideration does not render an agreement enforceable against the promisor him-

self, nor against any one in whose favor he has altered his original intention, yet, if an intended gift, based upon such meritorious consideration, has been partially and imperfectly executed or carried into effect by the donor, and, if his original intention remains unaltered at his death, then equity will, within certain narrow limits, enforce the promise thus imperfectly performed as against a third person claiming merely by operation of law who has no equally meritorious foundation for his claim. The equity thus described as based upon a meritorious consideration, only extends to cases involving the duties either of charity, of paying creditors or of maintaining a wife and children."

Precisely what the narrow limits are, within which the equity referred to may be invoked to support a provision for children, are not easily defined. The serious conflict of opinion as to the existence of the equity at all, and the subversion it threatens to salutary rules of law, admonish that its application should be made only in extreme cases where natural equity demands that there must be a remedy.

In England meritorious consideration has been deemed sufficient to justify the court of equity in supplying surrenders of copyholds against the heir, and in supporting defective executions of powers, where the defect is formal, against the remainderman, such powers being those which have been created by way of use as distinguised from bare authorities conferred by law. The recognition of its sufficiency in those cases appears to conflict in principle with its rejection in other cases in the English courts. But if its recognition in those cases be not exceptional in character, as suggested by Judge Story (*2 Story Eq. Jur. 120*), it is, at least, assured by force of repeated adjudications. I most seriously doubt whether those adjudications should be regarded as precedents beyond the class of cases to which they have been almost uniformly applied.

The case of *Ellis* v. *Nimmo, Lloyd & G. temp. S. 333,* was decided by Sir Edward Sugden, the lord-chancellor of Ireland, after an exhaustive review of preceding English cases. It presented the question whether a meritorious consideration would support a voluntary agreement by a father in favor of one of his children, and decided that question in the affirmative. But later, in *Holloway* v. *Headington, 8 Sim. 324,* which was a case in which a wife and her husband conveyed all the wife's property to trustees for

Landon v. Hutton.

the benefit of the wife and husband, and the survivor of them and their children, as the wife should appoint, and in default of appointment for the wife's children by any husband, the wife separated from the husband and sought to have effect given to the settlement, Vice-Chancellor Shadwell said that *Ellis* v. *Nimmo* had been re-heard by a succeeding chancellor, who rejected the grounds of decision taken by Lord-Chancellor Sugden, and that, therefore, that case was no authority upon the question whether a meritorious consideration will support a post-nuptial agreement in favor of children, and he held that such an agreement was voluntary, giving children no rights.

I do not know whether it is reported, but I have not found the case to which Vice-Chancellor Shadwell alludes. I, however, find *Moore* v. *Crofton, 3 Jones & La.T. 442,* in which Lord-Chancellor Sugden himself said this of *Ellis* v. *Nimmo* : "I think it was decided upon sound principles of equity ; but I am aware that the opinion of the profession is otherwise. Before the case was decided there was a general impression that a voluntary contract though meritorious could not be enforced in this court, and that impression has not been removed. I drew the distinction between a mere voluntary agreement and a voluntary agreement to provide for a wife and child—I did not carry it further—which I thought, and still think, ought to be enforced; but I consider that decision to be overruled by the current of opinion and authority, and I have no desire to support it against the general opinion."

Following *Holloway* v. *Headington* came *Dillon* v. *Coppin, 4 Myl. & C. 647,* and, later, *Jefferys* v. *Jefferys, 1 Craig & P. 137,* which appears to have established the English rule. In this case a father covenanted, in consideration of natural love and affection, to surrender certain copyhold hereditaments in trust for the maintenance of his daughters. He did not make the surrender, and died leaving a will by which he devised the copyholds to his wife, who entered upon them. A bill to enfore the covenant was dismissed.

An ante-nuptial agreement of similar character is enforced because of the valuable consideration of subsequent marriage enters

into it. *Price* v. *Jenkins, 4 Ch. Div. 483; S. C. on appeal, 5 Ch. Div. 619; Gale* v. *Gale, 6 Ch. Div. 144, 148.*

In *Gale* v. *Gale* Lord-Justice Fry said : " No doubt the result is singular, because, as *Jefferys* v. *Jefferys* shows, if a similar settlement is executed, but not upon marriage, the court will not enforce it in favor of the children as volunteers."

Judge Story (*1 Story Eq. Jur.* § *433*) takes the view that it is settled that equity will not interfere between volunteers, but will leave the parties where it finds them as to title. He said :

" It will not aid one against another, neither will it enforce a voluntary contract. It has been said that there are exceptions, and that they stand upon special grounds, such as the interference of courts of equity in favor of settlements upon a wife and children for whom the party is under a natural and moral obligation to provide. But although the doctrine in favor of such exceptions has been maintained by highly respectable authority, yet it must be now deemed entirely overthrown by the weight of more recent adjudication, in which it has been declared that the court will not execute a voluntary contract, and that the principle of the court to withhold its assistance from a volunteer, applies equally whether he seeks to have the benefit of a contract, a covenant or a settlement."

Again (*2 Story Eq. Jur.* § *987*), he said :

" But against what persons courts of equity ought, in favor of a wife or children, to interfere, was a point which was thought to admit of more question. It was said that they ought to interfere to enforce the specific execution of such voluntary contracts or voluntary articles against the heir at law of the voluntary settlor, unless, perhaps, where he was a son wholly unprovided for. But whether they ought to interfere against the settlor himself in such a case was a matter upon which there was more diversity of opinion and judgment. However, the whole doctrine seems now overthrown, and the general principle is established that in no case whatsoever will courts of equity interfere in favor of mere volunteers, whether it be upon a voluntary contract or a covenant or a settlement, however meritorious may be the consideration, and although they stand in the relation of wife or child."

A similar view of the effect of the later English cases is taken by Mr. Adams, in his work on *Equity* (at *p. 78*); by Mr. Lewin, in his work on *Trusts* (at *p. 81*), and by the English editors in their note to *Ellison* v. *Ellison, 1 Lead. Cas. Eq. (pt. 1) 291,* though a contrary view is expressed by the American editors in their note

Landon v. Hutton.

to the same case, in which it is also shown that the tendency of the American cases is to adopt in substance the view of Professor Pomeroy.

In our own state I find three cases which deal with the subject of meritorious consideration. The first is *Gevers* v. *Wright's Executors, 3 C. E. Gr. 330,* where there was an ante-nuptial settlement whereby the intended wife conveyed and assigned to trustees all her property, real and personal, which she then had, or which she might thereafter acquire or become entitled to, in trust, to hold it for her own use for life and, at her death, to dispose of it according to her appointment by will, and, in event of her failure to appoint, to the issue of the proposed marriage, with provision for the event of failure to appoint and failure of issue. She became entitled to a share in her father's estate after her marriage and the birth of issue. Upon her application to the executors of that estate for her portion thereof they refused to pay it to her, because they claimed that her ante-nuptial settlement operated as an agreement to transfer that interest to the trustees, which equity would enforce. She and her husband then filed their bill, to which the executors and the issue were made the defendants, asking that it might be decreed, among other things, that the marriage settlement did not affect her interest in her father's estate. Upon hearing the case Chancellor Zabriskie pronounced this *dictum :* " But courts of equity will not aid and give validity to contracts or instruments which are of no effect at law, in favor of volunteers, but only when the contract or right sought to be enforced or established is founded on a valuable or *meritorious* consideration." Then he added : " Whether the making a provision for a wife or child on account of the duty of a husband or father to provide for wife and children, is such a meritorious consideration as contra-distinguished from a valuable one, as will entitle to relief in equity to enforce a contract of settlement not valid at law, is a point upon which the courts have differed." And also said : " The children themselves are mere volunteers in whose favor no contract would be enforced, if making provision for a child is not a meritorious consideration, except an ante-nuptial marriage contract." He, however, left the question

as to the validity of meritorious consideration without expression of decided opinion, and determined the case upon the ground that in point of fact it was not the intention of the agreement to provide for the issue, and that the settlement did not operate as a contract to convey after-acquired property to trustees for their benefit.

The next case is *Methodist Episcopal Church* v. *Town, 2 Dick. Ch. Rep. 400,* in which Vice-Chancellor Pitney advised a decree to reform a deed which was not sustained by valuable consideration, for a plot of land intended to be conveyed in fee to the church, by the insertion of the word "heirs." The grantor was a member of the congregation of the church and a constant attendant upon its services. The vice-chancellor held that the religious instruction and consolation that he received constituted a meritorious consideration for the deed to the church—a charity—which would induce a court of equity to supply the defect in the deed. He said that he could not distinguish in principle between the cases of want of surrender of a copyhold estate and the defective execution of a power, and the case before him.

The third case is that of *Conover* v. *Brown, 4 Dick. Ch. Rep. 156,* in which a father made his promissory note for $1,000 to each of his five daughters, adding to it, over his signature, the words "witness my hand and seal," but failing to affix a seal. His executors paid to four of the daughters the amounts of their respective notes, but they refused to pay the note of the fifth daughter, who had died after her father. This case was also heard by Vice-Chancellor Pitney. It appears that the note was in fact without valuable consideration to support it. The question was whether the court of chancery, because of meritorious consideration, could supply the seal which the father had neglected to affix. The vice-chancellor said : "It is true that the exercise of this jurisdiction of a court of equity has been generally confined to cases of the defective execution of a power, or to supply the surrender of a copyhold estate, but where that power has been exercised upon the sole consideration of the parental duty to provide for a child, the principle upon which the court has acted has been that the duty which the parent has to provide for his child

is a sufficient consideration, which a court of equity recognizes as good as distinguished from valuable, and I am unable to perceive any reason why this underlying principle should not be applied in the case of a sealed bill or bond given to a child."

In the last two cases is found, in this court, distinct recognition of the equity which is founded on meritorious consideration. The latter of them deals with that equity as springing from the very relation which is claimed to have given it life in the case before me, but I conceive the circumstances there considered to present a much clearer case of exercise of the parental duty than this. That duty is provision and maintenance, which is clearly distinguishable from possible self-benefit or mere voluntary bounty. The case where a parent of his mere pleasure would bestow a gift upon a child or where he would bestow it to possibly obtain a benefit for himself is not like the case where permanent or final provision for the maintenance of a child, in performance of a natural duty, is contemplated. In the former of these cases I can perceive no sufficient reason why the child should not stand like a volunteer before the law. In the latter, natural duty is the predominating element and presents a reason for an equity.

I conceive *Conover* v. *Brown* to partake of the latter character. The father provided equally for all his daughters. His purpose was to give them an instrument importing valuable consideration and therefore, upon its face, valid in the law. It was intended to be a final equal provision for all of his daughters, who were natural claimants to his bounty and protection.

Such is not the case now before me. Here permanent provision for the maintenance of his children had already been amply made by Mr. Hutton in his will. In the first transaction stated he proposed to forgive a debt to aid his daughter in the laudable undertaking of liquidating her husband's indebtedness and, at the same time, to possibly advantage himself by facilitating the payment of the remainder of the indebtedness due to him. And in the other transaction his purpose was to conform with the wishes of a deceased wife. In neither case was the performance of his natural duty to maintain his offspring the potent factor which actuated him.

I do not think that there is meritorious consideration in this case sufficiently strong to raise the equity contended for. If it should be given effect in such a case it will be difficult hereafter to restrict its application within safe limits. If it continues to have a place in our system, I am strongly of opinion that that place, when the relation is that of parent to child, should be plainly within a single and well-defined intention to execute the natural parental duty to support and maintain, partially carried into effect, which cannot be defeated without obvious injustice.

It was suggested at the argument that the release of indebtedness to the Countess de Moltke-Huitfeldt was made in France and may have effect under the French law. In absence of proof of that law, I have assumed that it is similar to our own, and, upon that assumption, have expressed my views. If the law be different and will change the result reached, it should be established by evidence. My understanding is that the stipulation between counsel will admit of such evidence being yet taken.

As the case stands, effect will be given to the trust, and the action of the executors, in disallowing the credit for fifty thousand francs, will be approved.